IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2004 Session

## IN RE: B. B. & T. S. B.

**Appeal from the Circuit Court for Perry County**
**No. 4178     Donald P. Harris, Judge**

---

**No. M2003-01234-COA-R3-PT - Filed June 9, 2004**

---

This appeal involves a petition filed by the Department of Children's Services to terminate the parental rights of Mother to two of her minor children. The trial court granted the petition and Mother appeals the decision. Because we find there was not clear and convincing evidence of a ground for termination, we reverse the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J. filed a concurring opinion.

David Kozlowski, Columbia, Tennessee, for the appellant, S.L.

Paul G. Summers, Attorney General and Reporter; Dianne Stamey Dycus, Deputy Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

At issue is the trial court's grant of the petition to terminate the parental rights of S.L. ("Mother"), in regard to two (2) of her minor children, a daughter, B.B., born November 14, 1989, and a daughter, T.S.B., born December 29, 1990.[1]

---

[1]Her oldest, a son, T.B.B., born April 20, 1988, was initially included in the termination petition but during the trial Mother consented to her parental rights being terminated with respect to T.B.B. after learning of her son's wish to be adopted by his foster family, listening to the testimony of B.B.'s foster mother, and recognizing that this foster home was an appropriate placement.

## I. FACTS

In 1991, the children were placed in foster care under the custody of the Department of Human Services (the predecessor to the Department of Children's Services) following allegations of neglect and concerns about their safety. Mother testified that her then husband and the children's father, T.B., voluntarily placed the children with the Department. Nonetheless, Mother concedes that she was not able to take care of her children at that time.[2]

Following the Department's non-suit of an initial termination petition filed in 1994, it developed a plan to reunite the children with Mother. Crucial to this effort was renewed supervised visitation between Mother and the children. The visits did not go well. The children became resistant to attending and developed disruptive behaviors at school and in their foster home.

In early 1996, the juvenile court granted the Department's *ex parte* motion to stop the visits. This ban on visitation remains in effect at the time of this appeal.[3] The expectation was that once the visits with Mother were stopped, the children's behavior would improve. In early 1997, following the suspension of Mother's visitation with the children, the Department changed the children's permanency plan goal to adoption. Although the behavior of the children initially improved after visitation was stopped, their behavior significantly deteriorated in 1998 and early 1999.

Until 1999, the children remained in the same foster home together.[4] In fact, DCS team supervisor Jim Griner testified that the Department's initial goal in 1994 had been to allow this foster family to adopt all three children. Not until DCS caseworker Tina Richardson, who had handled the children's cases for many years took another position did the Department begin to question the appropriateness of the placement of the children in their long standing foster home.[5] Around this

---

[2]Mother married when she was only thirteen and a half years old, and was a mother to the three children by age eighteen. Mother stated she was too young to have children and knew little about being a parent because "I didn't have no parenthood when I was growing up." Raised by her grandmother, Mother explained that she did not attend school as a child and is illiterate.

[3]After her visits were stopped, Mother did what she could to see her children. She tried to get information about the children without success. She attended the Foster Care Review Board meetings and the staffings when she knew about them.

[4]DCS caseworker Tina Richardson acknowledged that Mother had repeatedly warned the Department that she had been sexually abused by the foster father when she was a child and that she wanted her children removed from his home. The Department did not act on her concerns.

[5]In October 2000, Mr. Griner received an e-mail from Lisa Nelson at the Center for Adoption referencing the fact that DCS Supervisor Mickie Pierce had removed Tina Richardson from the children's cases because she had lost her "objectivity."

time, the children were referred to the Center for Adoption,[6] and Susie Jackson and Kelly Ann Nichols with the Center were assigned to work with the children.

The children, particularly B.B., were exhibiting behaviors typical of a child who has been physically or sexually abused. Jeannie Horton with DCS, Ms. Jackson, and then Ms. Nichols suspected that the children had been abused in the foster home and conducted an investigation. Indeed, Ms. Horton called in the foster mother concerning allegations that she had whipped B.B. with a spoon in clear violation of the DCS discipline policy. Ms. Horton testified that she believed B.B. was telling the truth about the incident.

Ms. Jackson explained that she had serious concerns about the foster home following her first visit. She explained that when she approached the home, she could hear a screaming match between an adult and a child going on inside. Once inside, Ms. Jackson was restricted to the front room of the house and explained she had never been denied access to a home during a visit before. The foster mother was speaking very negatively about the children's mother. In addition, the foster mother belittled the children in front of her during the visit. Ms. Jackson testified

> I have real issues with any adult belittling a child, and most certainly in front of one that's suppose to be over their adoption. . . . I mean if you're so brazen as to do that, what are you doing when I'm not there.

In addition, Ms. Jackson was further disturbed by information from the school system that concerned the foster mother's attitude toward the girls. She testified that the school telephoned the foster mother after T.S.B. had engaged in self-mutilation, and the foster mother replied she "didn't care whether she bled to death or not"and did not take her to the doctor until her husband came home. The school was concerned when the foster mother made the comment she was going to change her phone number because "if [they] knew how bad T.S.B. was, then they would know how horrible of a child she is."

At this point, the Department realized that the foster home was part of the problem. At trial, a DCS supervisor conceded that "we could have been wrong" about the quality of the foster home. The trial court also concluded that:

> [t]he behavioral problems the two girls were exhibiting were described as typical of behaviors exhibited by children who are being or have been abused. If the emotional and psychological problems which the two girls developed have an external origin, the mistreatment by these foster parents is the most probable cause.

---

[6]The Center for Adoption is part of Child and Family Services, and it contracts with DCS to arrange adoptions for special needs children in the Department's custody. Typically, the Center has a caseload between 400 and 500 special needs children.

At the trial, DCS conceded that the foster home was "not a good environment" for the children. The children were removed from that foster home in 1999 and went to different placements due to their individual emotional, psychological and behavioral needs.

After the Department removed T.S.B. from her longstanding foster home, she was placed in a therapeutic foster home[7] in the Cookeville area. Barbara Campbell with OmniVisions, a therapeutic foster care agency, testified that she placed T.S.B. and that the child had been in the same therapeutic foster home for the last three years. Ms. Campbell explained that this placement is not a pre-adoptive placement. T.S.B. has significant behavior problems; she can be physically aggressive and exhibits severe temper tantrums. At times, T.S.B. has to be restrained to prevent her from hurting herself or others. She has become extremely oppositional defiant to the point that the school had to return her to the behavioral classroom. Her medication had to be increased due to her temper tantrums. Regarding needed parenting skills, T.S.B. needs "a lot of consistency, a lot of structure, a lot of love." T.S.B. has a hard time dealing with change. Ms. Campbell testified that T.S.B. "believes she has a meaningful relationship" with her Mother, cannot give a "concrete" answer about whether she wants to be adopted, and has asked about going home to be with her birth mother, although Ms. Campbell characterized that possibility as "fantasy."

Ms. Nichols added that T.S.B. was twelve at the time of the termination hearing. She is in special resource classes and has obtained a second grade reading level. She is on medication to help with her mood swings and sleep. T.S.B. has difficulty getting along with peers and is "bossy."

B.B.'s situation is much worse than T.S.B.'s. Following her removal from the foster home, where she was demonstrating symptoms indicative of sexual or physical abuse, she experienced significant problems. At the time of trial, she had been in the Middle Tennessee Mental Health Institute ("MTMHI") for a year and a half. This was her second long stay at MTMHI. When not at MTMHI, B.B. was in twenty separate placements over a one year period. B.B. exhibits suicidal tendencies and has even had delinquency charges brought against her because of aggressive behavior. B.B. has expressed an interest in visiting with Mother. The case worker frankly had no idea how termination of parental rights would impact B.B. and did not know whether visitation with her mother would help or harm B.B.

According to Ms. Nichols, B.B. is generally a very loving and kind child. However, when she gets upset, she can become violent. B.B. is on medication for her Attention Deficit Disorder and for mood swings associated with her bi-polar disorder. In addition, B.B. experiences psychotic features where she can have command hallucinations and auditory, visual hallucinations at the same time. At the time of trial, B.B. was doing better and looking at being placed in a step-down, less restrictive, facility such as a group home or a therapeutic foster home.

---

[7]A therapeutic foster home differs from a regular DCS foster home in that it deals with more serious behavioral problems, including physical aggression. These foster parents receive a "higher level of training, more intense." Only two children can be in a therapeutic foster home at one time. At the time of trial, a birth child was in the home with T.S.B.

Despite the revelations about the mistreatment the children suffered in foster care, the Department inexplicably never rethought its position that Mother was the cause of the children's behavioral problems.[8] Since 1997, the Department has done nothing to restart visitation between Mother and the children. Although Ms. Horton was assigned to be Mother's contact and was involved in the investigation of the foster home, she has never visited Mother's home in the two years she was assigned the case. Indeed, the record contains no proof that DCS made any contact with Mother since 1997. In 2000, the Foster Care Review Board recommended that DCS set up a process where Mother would at least be periodically updated on what was happening with the girls. The Department assigned a Wayne County case worker to make those reports, but the reports were never made.

Indicative of DCS's attitude toward reuniting Mother with her children and its lack of knowledge about Mother is the following exchange during Mother's attorney's cross-examination of Jim Griner concerning whether Mother had complied with the Department's permanency goals:

Q.   Did I understand correctly your testimony to be that it was your position as a representative of the Department that [Mother] has not complied with these provisions, these objectives as of today?

A.   That's correct.

Q.   Well, let me see if I can get some sense as to how you know that. And I mean, not necessarily you as the supervisor today, but you as the Department. You've had a chance to look at the record.

A.   They're very voluminous.

\*\*\*\*

Q.   Now let me go back to my question as to how you as a representative of the Department can testify -- let's take a look at number 1, numbered paragraph 125 which says, "Provides safe and secure home." I assume that means that [Mother] was required to have a safe and secure house where she was living and where the children might live?

A.   Uh-huh (affirmative). Yes.

Q.   Okay. Ms. Jackson in her deposition testified that she had visited with [Mother] at her home in Lewis County sometime in the late summer, early fall of 1999. Do you have any record or do you see any record that indicates

---

[8]Jim Grinder conceded that "what was going on could have been caused by another reason other than what we thought at the time."

that anybody who works with the Department has visited [Mother's] home since 1999?

****

Q.   At some point though with Ms. Horton, at some point in 1999 the case was referred to the Center for Adoption? The children's case?

A.   And that's where the confusion arose. We at the Department had previously done our own adoptions. And when the Center for Adoption came into being, there was a referral system set up so that we would refer our cases that were ready for adoptive placement to the Center for Adoption.

Also during that time we were told that the Center for Adoption would take the cases and finish up writing termination summaries; finish termination of parental rights, if that was necessary; work with parents; do whatever was necessary to get the children adopted. So we operated under that premise for quite some time before we learned that the Center for adoption didn't do all those things. And so --

Q.   But as some point --

A.   At some point Ms. Horton was told, you are the contact person for [Mother] . . . . If she needs anything, she's to contact you. You are the contact person. If somebody calls you and tells you that she needs something, you have the record.

Q.   Well, let me go back to my question. And Ms. Horton testified in her deposition that she has never visited [Mother's] home. You have any indication that anybody from the Department has visited her home since 1999?

A.   Probably not.

Q.   But you're saying that she has not provided a safe and secure home. That's your testimony today?

A.   Yes.

Q.   And that's based upon what?

A.   Based upon my reading of the record.

6

Q.   Have you talked about her home to Ms. Hood, the Guardian ad Litem, who actually has been there?

A.   Yes.

Q.   You've talked with her about it?

A.   No.

Q.   This talks about maintaining a source of income as something that [Mother] had to do, correct?

A.   Yes. Yes.

Q.   And I think that, if I'm looking -- and this one is the July 30, 1999.

****

Q.   This says, '[Mother and J.J.], need to maintain a consistent source of income.' Hasn't [Mother] gotten SSI benefits, from the day that you've known her?

A.   I believe she has.

Q.   Is that not income?

A.   Yes.

Q.   Where that she's gotten child support for [youngest daughter] sometimes from [Father].

A.   It seems that I recall seeing that somewhere, but I'm not sure.

Q.   So what hasn't she done to maintain source of income, or "consistent source of income," as this says?

A.   Well, a man and woman and five children can't live off of one person's SSI check.

Q.   Really?

A.   And have everything they need.

****

7

Q.    . . . .[I]f we go around Perry County identifying people who live on SSI income only, you're not going to take those children out of their home; are you?

A.    No.

Q.    Number 15, numbered three says, "Have psychologicals done." Now I notice that's not on the more recent foster care -- excuse me, care -- plan of cares, permanency plans. I assume at some point psychologicals were done?

A.    I think they were done, yes.

Q.    Number five says, "Demonstrate ability to supervise children" in the 1996 report. Now that isn't in the 2000 -- again No. 4, the 1999, that's not in that plan. Does that mean she did that or was no longer any need to do that?

A.    I would think that -- I probably wasn't there when staffing was done. But my thinking would be that the plan was just written in a different way.

Q.    All right.

A.    That some of these responsibilities that are worded one way one year might get worded another way in another year.

Q.    But if I understand you, testimony earlier was that [Mother] hasn't demonstrated ability to supervise children. So she hasn't met this particular part of the plan, the 1996 plan?

A.    No.

****

Q.    Let me go back again. Again having nobody from the Department go her house, see her with her two children that she now has, how in the world are you testifying that she doesn't know how to supervise children? Do we have information in 1999, 2000, 2001, 2003 that . . . ., the two children with her, are not being supervised?

A.    In this mind this is not talking about [younger children]. This is talking about [B.B. and T.S.B.].

Q.    All right. So the answer is that you don't have any information that she's not supervising [younger children]?

8

A.    No, I don't.

Q.    Okay. And reports that she hasn't had any contact with [T.S.B. or B.B.] since January 1996, how can she demonstrate an ability to supervise them?

A.    Well, I recall reading one of the plans, or one of the reviews from the Review Board that the suggestion was made that she come up with a safety plan.

Q.    That she write out a safety plan?

A.    Yes, that she write up a safety plan that would show what she would do in certain situations in order to protect children from abuse and so forth. And I don't think that that ever came through.

Q.    Of course, she's illiterate, correct?

A.    Yes. But not totally.

Q.    Number six says, "Learn nutrition, safety, and sanitary skills." Is your testimony that the department does not believe that she has learned nutrition, safety, or sanitary skills?

A.    I don't know that.

Q.    Okay. Seven, "Provide own transportation." Is it your testimony that she hasn't complied with that provision?

A.    There used to be a problem with that. I don't know if there is any more.

****

Q.    And to some extent objectives for parents are superfluous or perhaps just filling in blanks on a sheet. I mean, there apparently were times that even though that was the goal [Mother] was still coming to some of the staffings and certainly to some of the Foster Care Review Board meetings, correct?

A.    Yes.

****

9

Q.      Well, you made a comment that the department worked hard for reunification.

A.      Yes.

Q.      Let me get the time frame that I'm looking at is as far as that goes. Is it '91-'92?

A.      Yes. And also after the first termination was dismissed and we started all over again, we worked hard.

Q.      Well, we spent a lot of time. But once the visits were cut off, what part of work was done after that toward reunification? Or is it just fair to say that particularly after the court approved adoption as the goal, that that pretty much cut out everything as far as working with this family? It may sound as logical, but --

A.      That's what's logical to me. That's what normally happens when the goal changes from reunification to adoption.

Q.      So there hasn't been any work at reunification since '96 or '97?

A.      No.

If the Department had taken a renewed interest in Mother, they would have discovered that her situation and parenting skills had improved. Despite her own deficient upbringing and her educational limitations, Mother has successfully been raising two younger children: T.B., who is eight, and J.B., who recently turned seven. Although her current income is limited, it is sufficient for Mother to take care of herself and her children; at the time of trial, she was receiving disability benefits and child support. T.B. and J.B. are well cared for and well adjusted children.

In fact, the children's guardian *ad litem* Ms. Hood, did make a home visit to Mother's residence and seemed impressed at the strides Mother had made. It was her opinion that Mother has done a "good job" raising the younger children, primarily living in Lewis County.[9] She has a car and a driver's license. The home where she lives has three bedrooms and two baths, allowing each of the children to have her or his own room. The children go to school and do well. J.B. had a speech problem, but Mother located resources to address that issue. Mother allows no illegal drugs or drinking in her home. Her home is safe, is clean, and has no conditions that would adversely impact on the safety of her children.

Not even the Department disputes that Mother loves all of her children. One of the DCS case managers commented that

---

[9]Ms. Hood, the guardian *ad litem*, questioned Mother on her home to demonstrate to the trial court how well she was caring for her two younger children at home, with home cooked meals, nicely decorated bedrooms for the children with books in them.

[a]nybody that's going to fight for as many years as she [S.L.] has, I don't know what else you can mark that up to other than she does care deeply for these kids.

Nonetheless, DCS filed a petition for termination of Mother's parental rights in Perry County Circuit Court on April 20, 2000.[10] The Department alleged that Mother had willfully abandoned the children, had not complied with the permanency plans, and had not remedied the conditions that existed at the time the children were removed and that other conditions now exist that will subject the children to further neglect.[11]

The trial was conducted the last two days of January 2003. Mother told the trial court that she thought the children deserved to at least know who she was.

> . . . . I think it is better for my children to know who I am. . . .Because they don't know who I am. They know what people has told them. They really don't know me, you know. I would like them to know who I am. . .[t]hat I am going to be there for them. Not abuse them. Love them. . . . I think about T.B.B., B.B. and T.S.B. everyday, you know. I know T.B.B's in a good home, but the girls is not. I want to be there for them. . . .
>
> They don't know me because ya'll wouldn't let them know me. That's how I feel. . . . I want what's best for the kids; them to know who I am; them to know that I love them and care for them and has fought all these years because I do love them.

Concerning the girls' wishes regarding adoption, Ms. Nichols explained that she helped the girls create a "life book," which explains both the meaning of adoption and the girls' past and their present. T.S.B. "waffles" back and forth concerning whether she wants to be adopted. With B.B., "it really depends on the day whether or not she is for or against, or what she really wants. She does not know." In Ms. Nichols' opinion, a ruling "one way or another" would be beneficial to the girls.

Regarding the girls' prospects for adoption, Kathy Rogers, the Director of the Center for Adoption, testified that she was confident that the girls could be adopted and that they were "typical" of their special needs children.[12] When cross-examined on this point by Mother's attorney, Ms. Rogers conceded she had not read the girls' files, just talked with the staff. When informed of B.B.'s needs, Ms. Rogers stated that roughly ten percent of their children have been institutionalized.

---

[10]In 1995, Mother divorced the children's father. On June 1, 1998, T.D.B, the children's father, surrendered his parental rights before Judge Cornelia Clark, Perry County Chancery Court.

[11]Mother began the discovery process after filing her Answer. However, the process bogged down. The Department took over sixteen (16) months to respond to Mother's first set of interrogatories. Finally, an Order was entered setting deadlines for discovery and scheduling the trial.

[12]Interestingly, Ms. Rogers explained that with special needs adoptions, the agency offers post-adoption support to the adoptive families for six months.

11

Nonetheless, Ms. Rogers insisted that B.B. and T.S.B. were "typical" because they needed a family and that in her opinion no child is "unadoptable, except for children who cannot form a relationship . . . . and represent only three to five percent of the population."

After commenting on the "especially tragic" circumstances of the case, the trial court concluded in its memorandum opinion that:

> While in the early years, [Mother] failed to comply with the plan for developing her parenting skills and acquiring the means to provide for these children, she now has developed those skills and acquired the necessities for caring for her children. She cannot be said to have abandoned the children subject of this action since she has been prohibited by court order from contact with them and her attempts to send gifts were met with rejection. She cannot, however, provide for the special needs of these two girls and as a result it is highly unlikely that they would ever be returned to her home. Placing the two girls in [Mother's] home would not be in their best interest and, moreover, would not be in the best interest of the two children for whom [Mother] now cares. It is also clear that maintaining a parental relationship between [Mother] and [B.B.] and [T.B.] significantly reduces the likelihood they will find adoptive homes.

> Accordingly, the court finds by clear and convincing evidence that [B.B.] and [T.S.B.] have been removed from the home of the parent, [Mother], for a period of more than six months and the continuation of the parent and child relationship greatly diminishes the two girls' chances of early integration into a safe, stable and permanent home. The court also finds it to be in the manifest best interests of [B.B.] and [T.S.B.] that there be a termination of [Mother's] parental rights so they may be available for adoption.

## II. STANDARD FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of

> severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject

12

of the petition to that parent or guardian. The parent or guardian shall have no further right to notice of proceedings for the adoption of that child by other persons and shall have no right to object to the child's adoption or thereafter to have any relationship, legal or otherwise, with the child. . . .

Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky,* 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). In addition, it must be shown that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

One of the safeguards required by the fundamental nature of the a parent's constitutional rights is that courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622; *Messier*, 905 S.W.2d at 186. To justify the termination of parental rights, both the grounds for termination and the fact that termination is in the best interest of the child must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *In re C. W. W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*,

559 S.W.2d 785, 787 (Tenn. 1977); *In re C. W. W.*, 37 S.W.3d at 474;  *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Thus, it was the burden of DCS to present "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence" that grounds exist and that termination would serve the best interests of the children. *In re Valentine*, 79 S.W.3d at 539.

In addition, where the Department seeks to terminate parental rights on a ground that implicates the Department's obligation to use reasonable efforts to make it "possible for the child to return safely to the child's home," Tenn. Code Ann. §§ 37-1-166(a)(2), -166(g)(2), those reasonable efforts must also be proved by clear and convincing evidence. *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at **7-8 (Tenn. Ct. App. March 9, 2004) (no Tenn. R. App. P. application filed).

Finally, because of the constitutional implications, gravity of consequences, higher standard of proof, and required individualized decision making, our legislature has explicitly required that courts making termination of parental rights decisions "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). The trial court is in the best position to make such findings. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In this court's review,  we must determine *de novo* whether DCS has proved its case by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 536. First, we must review each of the trial court's specific findings of fact *de novo*, with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). Then, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49.

### III. GROUNDS

The only ground at issue in this appeal and the only ground found by the trial court is persistence of conditions which prevent the children's return to Mother's home.[13] That ground is set out in Tenn. Code Ann. § 36-1-113(g)(3)(A), and allows a trial court to terminate the parental rights if:

> The child has been removed from the home of the parent or guardian by order of a
> court for a period of six (6) months and:

---

[13]DCS alleged other grounds in the trial court. That court correctly concluded that Mother had not abandoned her children because she had been cut off from any contact with them by judicial fiat. The trial court also correctly concluded that the Department failed to present proof that Mother had not complied with relevant permanency plans. DCS has not pursued either ground on appeal.

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Under the clear language of the statute, the conditions which prevent the child's safe return to the home may be either (1) the conditions that led to removal or (2) other conditions likely to cause further neglect.

In its order, as set out above, the trial court specifically found (1) the children had been removed from Mother's home for more than six months, (2) that continuation of the parent-child relationship diminished the girls' chance of integration into a safe, stable, permanent home, and (3) that termination of Mother's parental rights was in the girls' best interest so they could be eligible for adoption. The court did not specifically find that a condition existed that made further neglect probable and prevented the safe return of the girls to the Mother's home in the near future. However, other findings by the court make it clear that the court considered the girls' emotional, psychological, and behavioral problems to be the required conditions along with Mother's inability, in the court's opinion, to "provide for the special needs of the two children now in foster care."[14]

It is this set of circumstances upon which the Department relies as the ground for termination. In its brief, the Department argues:

In this case, there are persistent conditions which in all reasonable probability would cause these children to be subjected to further abuse or neglect and, therefore, prevent

---

[14]Here, the original condition that led to the children's removal from Mother's home was neglect. The Department did not prove by clear and convincing evidence that Mother's current situation would lead to further neglect. In fact, the trial court found that Mother's parenting skills had greatly improved as evidenced by her parenting of her two youngest children:

[Mother] has apparently done well with the two children now living with her. They appear to be well fed, appropriately clothed, and to have affection for their mother. They are doing well in school. Their home is clean and safe. The mother has a means of transportation. [Mother] appropriately seeks assistance from others when she is not able to meet the needs these children have. While [Mother] has significant limitations because of her illiteracy and lack of formal education, she had developed the parenting skills necessary to provide an appropriate home for these two children.

15

their return to [Mother's] care. There is no dispute that both [T.S.B.] and [B.B.] are special needs children. Based on the need for consistency and structure and [Mother's] limited abilities, these children cannot be safely returned to her care.

* * * *

Given her significant limitations due to her illiteracy and lack of formal education, [Mother] is not capable of developing the parenting skills needed to address the special needs of these children.

## IV. IS THERE CLEAR AND CONVINCING EVIDENCE ?

Consequently, the questions before us are (1) whether the Department proved by clear and convincing evidence that the girls have serious problems and special needs and that Mother is unable to provide the parenting to meet those needs, and (2) would these circumstances, in all reasonable probability, subject the children to further neglect and, therefore, prevent the their safe return to Mother's home in the near future. Additionally, did the Department prove by clear and convincing evidence that "there is little likelihood that these conditions will be remedied at an early date so that the child[ren] can be safely returned to the parent . . . in the near future."

The proof clearly shows that the two children have serious emotional, psychological, and behavioral problems that have required treatment, counseling, medication, and specialized placements. There is no proof that any of these problems were due to or exacerbated by Mother's contact with the children. In fact, we agree with the trial court's assessment that if any external factor can be said to have caused the problems, it was probably the mistreatment by the foster parents. The Department placed the girls in this foster home and left them there despite Mother's insistence that it was not a good placement. The Department chose to attribute the children's behavioral problems to their visits with Mother, rather than to investigate the situation in the foster home, including the possibility that the foster parents influenced the children's behavior at the visits. Regardless of the factors contributing to the serious problems the girls now face, however, we agree with the Department that it is the children's current circumstances that are relevant.

There is no dispute these children have special needs. They have been in specialized or therapeutic placements for over three years. There is no clear proof that they will be able to live in anything other than a therapeutic placement anytime soon. Thus, their condition alone may prevent their return to Mother's home or to any other home "in the near future," in the language of Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

However, we cannot conclude that the girls' condition alone establishes grounds for termination under the persistent conditions ground, and the Department does not argue that is the case. DCS conceded that Mother was an appropriate parent to her younger children, but argued that due to her lack of education and limited means, she would be unable to navigate the mental health

16

services that the girls would need or to provide appropriate parenting. It is in this area that we find the proof lacking.

There is no clear and convincing evidence to support a conclusion that Mother is unable to provide a suitable home for her daughters or meet their special needs in the event they ever improve enough to be moved from their current placements. The difficulty the Department had with this proof stems from the fact that the Department had no current information about Mother or her situation. No one from DCS has visited Mother's home since 1999. The Department made no further efforts with Mother after the visits between Mother and the children were stopped. For some period of time, Department workers apparently thought the Center for Adoption was responsible for gathering and documenting information relating to possible termination.

The Department obviously gave up on attempting to reunite the family when the visits were stopped. Even when it discovered the mistreatment or abuse in the foster home, a possible and likely cause of the misbehavior that led to the cessation of the visits, the Department did nothing to restart those visits or to explore reuniting the family. Consequently, the Department had no current information and presented no proof regarding Mother's current situation, her ability or inability to parent these children, or any attempts by the Department to provide her with training and assistance she would need to successfully parent them.

Although the Department supervisor testified that a psychological assessment of Mother had probably been done, none was entered into the record. The Department did not prove that it had any current assessment of Mother's ability to learn the skills needed to deal with the special needs of the children. DCS has not even considered the possibility or given Mother an opportunity to join in counseling with and training for handling the girls' needs. Since 1999, when DCS discovered the abusive foster care situation, the record indicates no one at DCS has ever proposed a plan to restart visits with Mother or allow the children and Mother to enter group counseling together. Further the Department did not prove that, if it had made reasonable efforts to provide those skills and support to Mother, that her inadequacies, if they exist, could not be remedied. Although employees of the Department were apparently comfortable in reaching that conclusion, we are not, because there is simply no proof to that effect.

The Department argues that the girls require the structure of a therapeutic foster or adoptive home. Of course, if the expectation is that they will remain in foster care, the need to terminate parental rights does not exist. At trial, there was testimony that therapeutic foster parents are given training in addition to that given to other foster parents. The Department has not offered this training to Mother or demonstrated that she is incapable of acquiring the necessary skills through such training. The Department further asserts that because of the issues they face, the children require consistency and structure as well as a parent with the ability to oversee a medication regimen. Again, it did not prove that Mother is currently incapable of meeting these needs.

The Department also argues that because of their intense behaviors and needs, the children need to be placed in a home with no more than one other child, thereby eliminating the possibility

of placing them in Mother's home where other children live. The basis for this argument is testimony that State regulation prohibits the placement of more than two children in a therapeutic foster home.[15] There was no testimony from a mental health professional regarding either of these particular children.

Ms. Nichols, from the Center for Adoption, testified as to the type of family or placement that, in the opinion of the Center, would be suitable for each of the children. Ms. Nichols is of the opinion that the girls should be the only children in a home and that they should not be placed in a home together. Consequently, she would search for adoptive homes meeting these criteria. However, there is no proof from any mental health professional who has treated these girls as to the type of environment that is needed for each or that the conditions desired by Ms. Nichols are a requisite for these children.

Mother testified and told everyone who would listen that she wanted to try to reintroduce herself to her girls and learn how to help them, but DCS continually turned a deaf ear to her pleas over the years. Since visitation was cut off, Mother has continued to try to get information about the children and their welfare. She attended Foster Care Review Board meetings, and consistently refused to agree to termination. She unsuccessfully attempted to contact the caseworker she was told was assigned to her children.

After a thorough review of the record before us, we conclude that the Department failed to prove by clear and convincing evidence that conditions exist that in all reasonable probability would subject these children to further neglect and, therefore, prevent their safe return to Mother's care and that there is little likelihood that any conditions preventing the children's return could not be remedied with sufficient training, support, and assistance by the Department in furtherance of its obligation to make reasonable efforts to reunify the family. Consequently, we find that the Department failed to prove the existence of any ground for termination of Mother's parental rights. The judgment of the trial court terminating Mother's parental rights is reversed.

## V. BEST INTEREST AND THE FUTURE

Because there was not sufficient proof of a ground to terminate, we need not reach the best interest analysis. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. We simply note that the trial court considered the special needs of the children and Mother's abilities in its best interest analysis.

Our reversal of the termination of Mother's rights does not change or affect custody of the children. *In re Valentine*, 79 S.W.3d at 550. When a petition to terminate parental rights is granted, Tenn. Code Ann. § 36-1-113(m) confers broad dispositional authority to the circuit court hearing the

---

[15]The regulation's application to this situation is questionable since Mother's home or any regular foster care placement is not a therapeutic foster home. In other words, if the children improve sufficiently to leave their therapeutic placement, the regulation presumably would not apply.

18

matter; however, our reversal of the termination order ends that matter, and the authority of the circuit court is at end. *See In re R.S.*, No. M2002-00919-COA-R3-CV, 2003 WL 22098035 (Tenn. Ct. App. Sept. 11, 2003) (no Tenn. R. App. P. 11 application filed). Consequently, jurisdiction over the custody of these children and related matters returns to the juvenile court that determined these children to be dependent and neglected. Tenn. Code Ann. § 37-1-103(a)(1); *Dep't of Human Servs. v. Gouvitsa*, 735 S.W.2d 452, 455-56 (Tenn. Ct. App. 1987); *In re R.S.,* 2003 WL 22098035, at \*19.

Thus, the decision of whether to allow Mother visitation with the children, if such visitation is requested, rests with the juvenile court. That issue is not part of this appeal. Having said that, we are deeply concerned that the no-visitation order entered in 1996 is still in effect if it has not been reconsidered in light of changed circumstances.[16] Given the Department's own admission that the children suffered abuse or at least mistreatment at their foster home, it appears that the misbehavior that resulted in Mother's visitations being halted was not actually attributable to Mother. If visitation is requested, and the Department for some reason opposes it, it seems to us that the Department would need to prove that such visitation would be harmful to the children.

In addition, as long as the children remain in the Department's custody, it has an obligation to prepare permanency plans for each child. The Department remains under a responsibility to make reasonable efforts to provide Mother with the tools she will need and the opportunity to demonstrate the ability to provide a safe, stable, and suitable home for these children according to their individual needs. We hope, in light of all that has happened to both the girls and the changes and efforts Mother has made, that the permanency plan approved by the court will include reasonable efforts to reintroduce Mother to her daughters. If Mother either cannot or does not comply with such a plan, or is unable to provide the parenting needed by these children with the necessary support and resources, then DCS will have another opportunity to petition for termination of her parental rights in the future.

## VI. CONCLUSION

This court deals with no issue of greater importance than termination of parental rights. There is no more significant action by the State in the context of civil proceedings. We are deeply aware of the gravity of any decision we make in these cases. We have given thorough consideration to the entire record in this case and to each argument propounded by the parties. Our decision is based upon our conclusion that DCS failed to meet the substantial evidentiary burden placed upon it by the United States Constitution, state statutes, and the courts.

Because the Department did not provide clear and convincing evidence that grounds for termination exist, we reverse the trial court's judgment. We agree that this is an "especially tragic" situation. Whether or not termination of Mother's rights would help ameliorate the consequences

---

[16]Nothing in the record before us indicates whether a modification has been sought.

19

to the children of the situation is simply not the question. Termination of Mother's fundamental rights can only be upheld when there is a statutorily established ground for that termination. Costs of this appeal are taxed to the Department of Children's Services.

_____
PATRICIA J. COTTRELL, JUDGE